*629 A.2d 646*

**LEGISLATIVE REDISTRICTING CASES.**

**Misc. No. 37, September Term, 1991.**
**Misc. Nos. 1, 5, 6, 16, 17, and 19, September Term, 1992.**

Court of Appeals of Maryland.

Aug. 24, 1993.

576

Misc. 37 Theodore Levin v. Governor of Maryland Argued by Theodore Levin for petitioner and argued by Robert Zarnoch, Asst. Atty. Gen., Baltimore, for respondent.

Misc. 1 Bruce Harris v. Governor of Maryland Argued by Theodore Levin for petitioner and argued by Robert Zarnoch, Asst. Atty. Gen., Baltimore for respondent.

Misc. 5 Robert Goldman v. Governor of Maryland Argued by Theodore Levin for petitioner and argued by Robert Zarnoch, Asst. Atty. Gen., Baltimore, for respondent.

Misc. 6 Joseph V. DiPierto v. Governor of Maryland Argued by Theodore Levin for petitioner and argued by Robert Zarnoch, Asst. Atty. Gen., Baltimore for respondent.

Misc. 16 Richard Rynd v. Governor of Maryland Argued by George Liebman for petitioner and argued by Robert Zarnoch, Asst. Atty. Gen., Baltimore for respondent.

Misc. 17 William J. Skinner, Rockville, and Sidney Weiner v. Governor of Maryland Argued by William Skinner for petitioners and argued by Robert Zarnoch, Asst. Atty. Gen., Baltimore, for respondent.

Misc. 19 In the Matter of the Legislative Districting of the State Argued by Dana Dembrow, Silver Spring, for petitioner and argued by Robert Zarnoch, Asst. Atty. Gen., Baltimore, for respondent.

Robert Zarnoch for the respondent was assisted by J. Joseph Curran, Jr., Atty. Gen., Carmen Shepard, Diane Krejsa, Kathryn Rowe, Dawna M. Cobb and Lucy Cardwell, Asst. Attys. Gen., and Linda Lamone, Special Asst. Atty. Gen.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This case involves a number of challenges to the legality of Maryland's Legislative Districting Plan, as enacted by Joint Resolutions 9 and 10 at the 1992 Session of the General Assembly.

## I

To ensure that the membership of the General Assembly continuously reflects the evolving population shifts throughout the State, Article III, § 5 of the Maryland Constitution provides in part:

Following each decennial census of the United States and after public hearings, the Governor shall prepare a plan setting forth the boundaries of the legislative districts for electing of the members of the Senate and the House of Delegates.

In accordance with his constitutional duty, Governor William Donald Schaefer, upon receiving the results of the 1990 cen-

sus, undertook to develop a redistricting plan for the General Assembly. In May, 1991, he appointed a five-member advisory committee to assist him; the committee came to be known as the Governor's Redistricting Advisory Committee (GRAC).[1]

The GRAC first met on May 30, 1991 in Annapolis, where it adopted a schedule for the redistricting process and the attendant public hearings.[2] On June 11, the Committee acknowledged the legal criteria which would constrain its decisions: equality of population between districts, minority representation, compactness, contiguity, and respect for natural boundaries and the boundaries of political subdivisions. These criteria stem from the mandates of the Equal Protection Clause of the Fourteenth Amendment, the federal Voting Rights Act, 42 U.S.C. 1971, *et seq.* (1993), and Article III, §§ 2–4 of the Maryland Constitution, which provide:

Section 2: The membership of the Senate shall consist of forty-seven (47) Senators. The membership of the House of Delegates shall consist of one hundred forty-one (141) Delegates.

Section 3: The State shall be divided by law into legislative districts for the election of members of the Senate and the House of Delegates. Each legislative district shall contain one (1) Senator and three (3) Delegates. Nothing herein shall prohibit the subdivision of any one or more of the legislative districts for the purpose of electing members of the House of Delegates into three (3) single-member delegate districts or one (1) single-member delegate district and one (1) multi-member delegate district.

---

1. The GRAC's members were: Benjamin L. Brown, an attorney from Baltimore, chairman; Thomas V. "Mike" Miller, President of the Senate; R. Clayton Mitchell Jr., Speaker of the House of Delegates; Norman Glasgow Sr., an attorney from Montgomery County; and Donna M. Felling, a former member of the House of Delegates from Baltimore County.

2. The Committee concurrently embarked on the project of redistricting the eight federal Congressional districts assigned to Maryland. That redistricting process is not before us. *See,* however, *Anne Arundel County v. State Admin. Bd.,* 781 F.Supp. 394 (D.Md.1991), *aff'd,* —— U.S. ——, 112 S.Ct. 2269, 119 L.Ed.2d 197 (1992).

Section 4: Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions.

The GRAC also indicated it would keep several other redistricting factors in mind, namely, established precinct lines, communities of interest, existing district lines, and the possibility of subdistricting to further accommodate minority representation and the boundaries of political subdivisions. Importantly, the GRAC recognized, even before the redistricting process began, that the legal requirements "may foreclose a uniform application of [the non-legal] guidelines . . ., and that the application of one or more of those guidelines may be precluded, in given situations, by the application of other guidelines." The Chairman of the GRAC also observed early in the process that while the redistricting procedure would not alter any actual borders of the political subdivisions, "new . . . legislative districts will in some instances cross jurisdictional boundaries just as existing districts do."

The GRAC then held a series of thirteen public hearings throughout June and July of 1991, in Salisbury, Easton, Centreville, Annapolis, Bel Air, Towson, Columbia, Frederick, Hancock, Rockville, Hyattsville, Hughesville, and Baltimore. The public was invited to attend these hearings through press releases in local newspapers and was encouraged to comment on the redistricting process and to submit alternative districting plans. At each hearing, every attendee received a packet of materials which included: (1) the 1990 census results for each of the existing legislative districts; (2) the redistricting and hearing schedules; (3) the legal and non-legal criteria bearing on the redistricting process; (4) background information concerning the 1990 census results and data sources useful for developing alternative districting plans; and (5) guidelines for the submission of alternative plans. Governor Schaefer attended the July 16 meeting in Hyattsville.

The public responded enthusiastically to the GRAC's open invitation to participate in the redistricting process. Approxi-

mately three hundred people testified in the 1991 summer hearings. Many other citizens submitted written testimony to the GRAC. The Committee and its staff at the Maryland Office of Planning also reviewed over forty separate districting plans submitted by the general public.

The GRAC worked throughout the fall, keeping Governor Schaefer constantly apprised of its progress. Ronald M. Kreitner, director of the Planning Office, met with the Governor no fewer than eleven times throughout late 1991.

On November 19, the GRAC chairman announced that, in the Attorney General's opinion, the federal Voting Rights Act required the creation of a new minority district along the Liberty Road corridor in western Baltimore City and southwestern Baltimore County. The GRAC asked the House and Senate delegations from both of those jurisdictions to work together and submit their preferred plan for the region's districts, taking account of the new minority district.

On December 2, 1991, the GRAC released its proposed redistricting plan to the public. It rescheduled its final public hearing from December 5 to December 10, at which the public was asked to comment on the plan. In his opening remarks at the December 10 hearing, the GRAC Chairman discussed the Committee's considerations in developing the plan. He said:

Paramount to our recommendations is the function of a state legislature. It is to represent people. And a plan for legislative districts is to provide people with a fair system of representation. State legislative districts are not substitute or a proxy for local government. The interest of state policy transcends that of local government and local political jurisdictions. As such, state legislative districts are drawn to:

1) Represent people fairly—Legislative districts fall within 5 percent of the ideal population of 101,733.[3]

---

3. The 1990 census determined Maryland's population to be 4,781,468 people. Thus, each of the 47 legislative districts would ideally contain 101,733 residents.

2) To be compact.

3) To provide minority voters the opportunity to elect candidates of their choosing.

4) Recognize communities of interest—where districts cross local jurisdictional lines and to group communities that share interests (interests such as shopping centers, utility systems, transportation, and other community facilities).

5) To keep municipalities whole where possible.

6) To support regional interests through the intra-regional sharing of districts.

Following the Chairman's opening remarks, approximately 100 people spoke on the proposed plan, including numerous members of the General Assembly as well as private citizens.

After making several changes to the plan in light of testimony from the December 10 hearing, the GRAC submitted the plan to the Governor on December 17. The Governor, in turn, submitted the plan to the General Assembly on January 8, 1992, in accordance with Article III, § 5 of the Maryland Constitution.[4] Another provision of § 5 allows the General Assembly to adopt a redistricting plan of its own, but if it fails to do so by the 45th day of its regular session in the second year after the census, the Governor's plan becomes law. Early in 1992, the General Assembly did consider several alternative redistricting schemes, but none passed. On February 23, Governor Schaefer's plan became law.

This development, predictably, left a number of people dissatisfied. Ten of them originally stepped forward to com-

---

4. This section specifies in relevant part:
 The Governor shall present the plan to the President of the Senate and the Speaker of the House of Delegates who shall introduce the Governor's plan as a joint resolution to the General Assembly, not later than the first day of its regular session in the second year following every census. . . .

plain to this Court.[5] They availed themselves of our review under yet another provision of Article III, § 5 which specifies:

Upon petition of any registered voter, the Court of Appeals shall have original jurisdiction to review the legislative districting of the State and may grant appropriate relief, if it finds that the districting of the State is not consistent with requirements of either the Constitution of the United States of America, or the Constitution of Maryland.

In Miscellaneous No. 37, September Term 1991, Theodore Levin, a Baltimore County resident and a member of the House of Delegates, launched two primary attacks on the Governor's redistricting plan.[6] First, Levin argued that the GRAC failed to provide adequate public notice of the redistricting hearings, in violation of the constitutional provision, quoted earlier, that the Governor must prepare a plan "after public hearings." Second, Levin claimed that the Governor's plan created districts which improperly crossed the Baltimore City/Baltimore County boundary, in violation of the constitutional provision, quoted earlier, that "[d]ue regard shall be given to ... the boundaries of political subdivisions." Three other petitioners, all Baltimore County residents whom Levin represented as counsel, joined Levin's arguments. They were: Bruce Harris, in Miscellaneous No. 1, Robert Goldman, in Miscellaneous No. 5, and Joseph DiPierto, in Miscellaneous No. 6 (hereinafter subsumed in all references to "Levin").

In Miscellaneous No. 16, Richard Rynd, another Baltimore County resident and member of the House of Delegates, echoed Levin's attacks on the Governor's plan and added several of his own. In addition to alleging "due regard" violations and inadequate notice of the public hearings, Rynd charged that the plan failed to create districts of "substantially equal population," that it violated the federal Voting Rights

---

5. Several other parties complained in the United States District Court for the District of Maryland, contending that the Governor's plan violated federal law. Those actions are still pending.

6. All subsequent case numbers will refer to cases dating from the September Term, 1992.

Act, and that it resorted to impermissible partisan gerrymandering.

In Miscellaneous No. 17, William Skinner and Sidney Weiner, Montgomery County residents, reiterated the charge that the Governor's redistricting plan violates the "due regard" provision, and that the plan creates districts of impermissibly unequal population. Skinner and Weiner further contended that the plan violates their First Amendment rights, and that it does not comprehensibly describe the districts it establishes.

Finally, in Miscellaneous No. 19, Dana Dembrow, a member of the House of Delegates from Montgomery County, joined other petitioners in arguing that the Governor's redistricting plan violates the "due regard" provision, improperly deviates from population equality, contravenes the Voting Rights Act, and engages in unlawful partisan gerrymandering. Dembrow also asserted that certain districts in the plan violate the constitutional requirement that districts "be compact in form." [7]

To deal with these various petitions, we appointed Marvin H. Smith, a retired judge of this Court, as a Special Master to receive evidence, hear arguments, and make a report to serve as the basis for our review. Throughout the fall of 1992, the Special Master received stipulations of fact and memoranda of law from the petitioners and from the State. On December 14 and 18, the Special Master heard oral argument from all parties. In a thorough report dated February 2, 1993, he organized the petitioners' contentions into ten distinct issues, evaluating each one in turn. He found no merit in any of the petitioners' claims.

In accordance with guidelines we issued, all but one of the

---

[7]. The other two original petitioners were Delegate John Bishop, Jr. and Senator Paula Hollinger, both of Baltimore County. Bishop withdrew his petition early in the proceedings. Hollinger's petition, which charged that the Governor's plan discriminated on the basis of sex by pairing two female incumbent Senators in the same district, is no longer before this Court for the reason stated in note 8, *infra*.

petitioners filed exceptions to the Special Master's report.[8] Eight issues remain before this Court.[9] From the procedural to the substantive, they are: (1) notice of public hearings; (2) district descriptions; (3) compactness; (4) population equality; (5) First Amendment; (6) Voting Rights Act; (7) partisan gerrymandering; and (8) due regard for boundaries.[10]

## II

### (1) Notice of public hearings

■ Petitioners Levin and Rynd take exception to the Special Master's finding that the GRAC provided proper public notice of the redistricting hearings. They argue that the GRAC violated the constitutional requirement that the Governor prepare a redistricting plan "after public hearings" in that the public was not provided with adequate notice of the scheduled hearings. Levin charges that though there was "ample opportunity" for public input at the summer hearings in 1991, those hearings were an "empty gesture" because the GRAC provided no notice that it was contemplating a scheme

---

8. Senator Paula Hollinger failed to take exception to the Special Master's finding that the Governor's plan did not discriminate on the basis of sex. Thus, that issue is no longer before us.

9. The Special Master considered as a separate issue Dembrow's allegation that the plan improperly created districts for the purpose of protecting incumbents. However, this claim merely refines the charge that the plan engaged in partisan gerrymandering, as the discussion of that issue, *infra*, will demonstrate.

10. In the 1980's redistricting litigation, we began our analysis of the claims there raised with an overview of applicable federal and state constitutional principles. *See In re Legislative Districting*, 299 Md. 658, 672–81, 475 A.2d 428 (1982). Since most of those principles remain the law today, we acknowledge that discussion as useful background for the instant case, particularly in the area of population equality. An updated overview is less appropriate here, however, because more nebulous issues, such as adequacy of notice and "due regard" for boundaries, comprise the focus of this case, as opposed to the oft-litigated and more concrete compactness requirement which dominated the 1982 dispute. We also caution that the law has changed significantly in the area of discrimination against minorities, as the discussion of the Voting Rights Act claims, *infra*, will show.

of regional representation in which districts might cross jurisdictional boundaries. Levin also claims that the GRAC substantially altered the plan in a late "flurry of activity" without adequately publicizing its endeavors. Finally, Levin attacks the GRAC's decision to advertise the redistricting hearings through press releases to local newspapers instead of through paid advertising notices in newspapers.

Rynd challenges the GRAC's failure to announce the factors it would consider in developing the plan in advance of the final hearing on December 10. He also asserts that notice of the December 10 hearing was not published far enough before the hearing, and he joins Levin's claim that the hearing was not announced in proper fora. Lastly, Rynd says that the Governor was obliged to attend the final hearing, which he failed to do.

We agree with the Special Master that there is no merit in any of these claims. On July 2, 1991, the GRAC held a redistricting hearing in Towson for the benefit of residents of Baltimore County, the political subdivision from which both Levin and Rynd were elected. In the ten days preceding the hearing, the GRAC sent press releases to the Baltimore *Sun* for publication on five separate dates, to the Baltimore *Evening Sun* for publication on six dates, and to the *Afro–American* for one date. The GRAC also published notice of the hearing in the calendar of the Department of Legislative Reference. This quantity of publication was typical for all the summer 1991 hearings.

The final hearing on December 10 was publicized twice in both the Baltimore *Sun* and Department of Legislative Reference calendar and once each in the Baltimore *Evening Sun* and *Sunday Sun,* the Annapolis *Capital,* the Prince George's *Journal,* the *Jeffersonian,* the Towson *Times,* and the Washington *Post.* With this degree of publication, and considering that, as mentioned earlier, some three hundred people spoke during the summer hearings and another hundred at the final hearing, we cannot conclude that notice of the redistricting hearings was generally inadequate. We also observe that,

though Levin and Rynd complain that notice of the redistricting hearings was insufficient, both petitioners attended, and spoke at, the Baltimore County hearing on July 2, 1991. Levin also attended and spoke at the final hearing on December 10.

As to the petitioners' specific claims, both Levin and Rynd argue that the GRAC should have published notice of the hearings in legal periodicals or legal columns of newspapers. But we agree with the Special Master that "the general public is much more likely to read and to comprehend" general newspaper announcements than legal advertisements. Levin responds that "publication by press release depends upon the good will of the news media as to whether the matter will even be published." Even if this is true, in this case the media *did* provide ample notice of the redistricting hearings. Undoubtedly, the newspaper notice in this case reached at least as many people as legal advertisements would have reached. Thus, the petitioners cannot legitimately complain that the substitution of press releases for legal advertisements significantly eroded public notice in this case.[11]

Levin maintains that the GRAC did not provide proper notice of its last-minute activities. In this regard, we note that Governor Schaefer charged the GRAC with, first, conducting public redistricting hearings and, second, developing a plan. The GRAC did just that. Levin seems to imply that the GRAC should have actually drafted the plan in a public forum, but of course the cacophony of opinion would have

---

11. Levin and Rynd both assert that the GRAC was compelled to follow the requirements of the Administrative Procedure Act (APA), Maryland Code (1984, 1993 Repl.Vol.) §§ 10–101 *et seq.* of the State Government Article, which specifies that notice must be published in the Maryland Register. This assertion is incorrect, because the APA applies only to Executive Branch "units," defined as "officer[s] or unit[s] authorized by law to adopt regulations." § 10–101(g). Here, even assuming the redistricting plan was a "regulation," neither the GRAC nor the Governor was a "unit," for neither was authorized by law to adopt the plan; rather, the plan became law only upon the General Assembly's inaction. Also, as the State points out, a statute such as the APA cannot control a constitutional gubernatorial function.

precluded significant progress. In what Levin terms a "flurry of activity," two events occurred late in the fall of 1991: the Attorney General informed the GRAC that the Voting Rights Act mandated the creation of a minority district in west Baltimore City/Baltimore County; then, a fortnight later, the GRAC released the plan. It is unclear what public notice the GRAC could have provided—or what Levin sought—during its final weeks of preparation.

Rynd argues, similarly, that the GRAC did not announce its final public hearing far enough in advance. Rynd cites this Court's order on July 31, 1973, in which we struck down a redistricting plan for failure to comply with the public hearings requirement. *See In re Legislative Districting*, 271 Md. 320, 317 A.2d 477 (1974). In that case, however, the public was invited to offer its views at only one redistricting hearing, which was announced in a solitary press release two days earlier. Here, by contrast, there were fourteen public hearings in all, widely announced through numerous press releases. The GRAC postponed the final public hearing for five days to ensure ample time for public assimilation of its proposal, then released that proposal eight days before the rescheduled hearing. Nearly a hundred people spoke at that hearing, and more presumably attended. These facts subvert Rynd's claim that the GRAC provided inadequate advance notice of its final public hearing.

Levin denounces the public redistricting hearings as generally unsatisfactory because the GRAC failed to announce that it was considering a scheme of regional representation, in which some legislative districts might cross jurisdictional boundaries. This claim is unfounded, for, as mentioned earlier, the GRAC's chairman announced shortly after the hearings began that "new . ... legislative districts will in some instance cross jurisdictional boundaries just as existing districts do." Moreover, testimony at the Baltimore County hearing referred to the possibility of districts crossing boundary lines, and Levin himself proposed a district that would cross the Baltimore City/Baltimore County line to preserve the Orthodox Jewish community in one district.

Rynd argues that the GRAC undermined proper notice of the redistricting hearings by neglecting to foretell the factors it would consider in developing the plan, which the GRAC chairman articulated at the final hearing. This too is incorrect. As explained earlier, the GRAC published the legal and non-legal criteria which would guide its decisions well in advance of even the first redistricting hearing, and these criteria encompassed the factors which the GRAC listed on December 10 as integral to the development of the plan. The first four factors announced on December 10 were explicitly mentioned in the guidelines published on June 11, and the last two—the goals of keeping municipalities whole and supporting regional interests—were logically subsumed within the June 11 guidelines of respecting the boundaries of political subdivisions and recognizing communities of interest. Without yet assessing the legitimacy of these considerations, we believe the GRAC gave ample public notice of them; at most, Rynd is quibbling with the GRAC's usage of different phrases to describe the redistricting factors.

■ Finally, Rynd argues that the Governor was obliged to attend the final hearing on December 10. He was not. There is no statutory or constitutional provision spelling out the proximity the Governor must maintain to the redistricting process; we believe the Governor's attending one meeting and remaining closely apprised of the GRAC's work on the redistricting plan was sufficient. As the Special Master eloquently observed, "In today's age it is simply necessary for the Governor to do many things through his agents, things which in an earlier, less busy, less harried generation, he might have done himself."

For the foregoing reasons, we reject the petitioners' claims that the GRAC provided insufficient notice of the redistricting hearings.

### (2) District descriptions

■ Petitioners Skinner and Weiner contest the Special Master's finding that the Governor's redistricting plan de-

scribes the districts it creates in a manner comprehensible to the ordinary citizen. They contend that the plan's reference to precincts and census tracts and blocks to specify districts requires voters to assimilate too much information to determine district boundaries. Skinner and Weiner claim that the plan should refer to visible geographical features, and that "if words cannot be used to describe boundaries, the simple solution . . . would be for the Court of Appeals to . . . publish the 47 maps setting forth the redistricting plan."

Skinner and Weiner cite no law specifying how districts are to be described, for indeed there is none. Article III, § 5 merely specifies that the Governor shall prepare a plan "setting forth" the boundaries of the districts, which the plan at issue here does. The Governor might reasonably prefer precinct and census references to actual geographical features in describing districts, for as legal creations those entities will not change before the next census, whereas natural or artificial landmarks may erode or succumb to development.

We agree with the Special Master that the Governor's plan adequately describes the districts it creates.

### (3) Compactness

■ Petitioner Dembrow alleges that the 20th legislative district created by the Governor's plan is not compact.[12] Dembrow asserts that "new political boundaries [of the 20th district] were skewed to such a degree that any observer would readily conclude a gerrymandered design upon first glimpse of a map. The district is anything but compact in form . . . ."

We pondered the meaning of the compactness requirement in some detail in the 1982 redistricting case, which involved a number of compactness challenges. After surveying the views of other jurisdictions, we found that "the ideal of compactness, in geometric terms, is a circle, with the perimeter of a district

---

12. The Special Master rejected Dembrow's original assertions that the 18th, 19th, and 20th districts were all noncompact. Dembrow only appears to take exception to the Master's finding as to the 20th district.

equidistant from its center." *In re Legislative Districting, supra,* 299 Md. at 676, 475 A.2d 428. However, we recognized that

> the compactness requirement must be applied in light of, and in harmony with, the other legitimate constraints which interact with and operate upon the constitutional mandate that districts be compact in form. Thus, it cannot ordinarily be determined by a mere visual examination of an electoral map whether the compactness requirement has been violated. . . .

*Id.* at 680, 475 A.2d 428. We concluded that

> it is not the province of the judiciary to strike down a district as being noncompact simply because a more geometrically compact district might have been drawn. . . . [T]he function of the courts is limited to assessing whether the principles underlying the compactness and other constitutional requirements have been fairly considered and applied in view of all relevant considerations.

*Id.* at 688, 475 A.2d 428.

These principles indicate that there is no merit in Dembrow's suggestion that district 20 is not compact. He has not shown, nor is there evidence of, any unconstitutional considerations factoring into the creation of district 20. Dembrow baldly alleges that district 20 was drawn to include certain potential candidates and to exclude others, but he offers no proof that such considerations led to its peculiar configuration. Just as plausibly, district 20 assumed an unusual shape in order to comply with the various other legal requirements for districts, such as population equality and due regard for political boundaries.[13]

Moreover, we note that district 20 is confined entirely to the southeastern corner of Montgomery County. Its shape, while

---

13. In fact, district 20 scrupulously hews to the Montgomery County/Prince George's County border, without crossing into the latter jurisdiction. It is therefore not surprising that its remaining boundary within Montgomery County is somewhat irregular, so that it might encompass the legally required number of residents.

unusual, is no more odd than the rest of the districts in Montgomery County, or, indeed, in the whole State. In other words, contrary to Dembrow's assertion, "upon first glimpse of a map" district 20 does not appear any more "skewed" or "gerrymandered" than any of the other districts. Also, district 20 under the Governor's plan is very similar in appearance to the former district 20, which survived a compactness challenge in the 1982 case. *In re Legislative Districting, supra,* 299 Md. 658, 475 A.2d 428.

We agree with the Special Master that district 20 satisfies the constitutional compactness requirement.

### (4) Population equality

Petitioners Dembrow and Skinner/Weiner object to the Special Master's finding that the Governor's plan complies with federal and state constitutional requirements that districts be of equal population. Dembrow asserts that even though the population disparities between districts do not *prima facie* invalidate the Governor's plan under applicable Supreme Court precedent, the plan is nonetheless impermissible because the districts could have been made more equal. Skinner and Weiner argue that the plan is not even *prima facie* valid under the federal constitution, and that it also violates the state constitution. The Special Master found no merit in these claims, and neither do we.

### (a) The Federal Constitution

■ After finding the general issue of legislative reapportionment justiciable in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court first announced the "one person, one vote" principle in *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963). This principle, which is rooted in the equal protection clause of the Fourteenth Amendment, prevents states from diluting any citizens' political power by assigning them fewer legislative representatives *per capita* than other citizens in the state. The one person, one vote principle, we noted in 1982, "is the *sine qua non* of fair representation, assuring that the vote of any citizen

is approximately equal in weight to that of any other citizen in the State." *In re Legislative Districting, supra,* 299 Md. at 672, 475 A.2d 428.

The Supreme Court's major explication of the one person, one vote principle as it applies to the apportionment of state legislatures came in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). There, the Court held that the principle requires a state to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." 377 U.S. at 577, 84 S.Ct. at 1390. The Court tempered its decision, however, by allowing that "somewhat more flexibility may . . . be constitutionally permissible with respect to state legislative apportionment than in congressional districting." 377 U.S. at 578, 84 S.Ct. at 1390. Chief Justice Warren explained for the Court:

A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. . . . So long as divergences are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both houses of a bicameral state legislature.

377 U.S. at 578–79, 84 S.Ct. at 1390.

In subsequent cases, the Supreme Court affirmed and refined the rule that states have greater latitude in apportioning their own legislatures than their allotted federal congressional districts. In *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Court upheld a 16.4% deviation from population equality in the Virginia House of Delegates, based on that State's policy of maintaining the integrity of political subdivision boundaries. The Court stated, "while [a 16.4% deviation] may well approach tolerable limits, we do not

believe it exceeds them." 410 U.S. at 329, 93 S.Ct. at 987.[14] Two months later, in *Gaffney v. Cummings*, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973), the Court decided that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." 412 U.S. at 745, 93 S.Ct. at 2327.

A decade later, in *Brown v. Thomson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), the Court held that maximum deviations of under 10% fall within the category of "minor deviations" that do not require justification by the state. In a companion case, *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the Court listed some of the permissible rationales which may justify deviation from pure population equality in legislative districts, "for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." 462 U.S. at 740, 103 S.Ct. at 2663. Recently, the Court reaffirmed the "10% rule" it announced in *Brown*. *Voinovich v. Quilter*, —— U.S. ——, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993).

In the instant case, as noted earlier, the 1990 census established that Maryland has 4,781,468 inhabitants. Each of the 47 legislative districts, therefore, should ideally contain 101,-733 residents. It is uncontested that the smallest district in the Governor's plan is district 40, which contains 96,682 people, and that the largest is district 30, which encompasses 106,690 persons. The population disparity between these districts—10,008 people—is 9.84% of the ideal district of 101,-733 persons. Thus, the Governor's plan has a maximum deviation from population equality of less than 10%; therefore,

---

14. Meanwhile, the Court had decided a series of cases in which it imposed a standard of strict mathematical equality on the apportionment of federal congressional districts. *See e.g. Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (striking down a Missouri plan with a maximum deviation of only 3.13%).

under the plain language of the Supreme Court's rulings, it satisfies the federal constitutional requirement of one person, one vote. The population disparities in the Governor's plan are sufficiently minor so as not to require justification by the State.[15]

Skinner and Weiner dispute this analysis. They attempt to distinguish the cases creating the "10% rule" on factual grounds. They argue that the plan does not adhere to the *Reynolds* requirement that States must "make and honest and good faith effort to construct districts ... as nearly of equal population as is practicable." 377 U.S. at 577, 84 S.Ct. at 1390. But the Supreme Court has unequivocally built a 10% degree of flexibility into the one person, one vote requirement so that states can accommodate important concerns in reapportioning their legislatures. The Governor's plan undeniably remains within that degree of flexibility, and is therefore valid under federal equal protection principles.[16]

---

**15.** The Special Master found the maximum deviation for the single-member delegate districts in the Governor's plan to be 10.67%, and for the two-member delegate districts to be 8.87%. Assuming the strictures of *Reynolds* and its progeny apply to subdistricts in a legislative districting plan, the deviation among single-member districts could conceivably require justification by the State. We note, however, that the 10.67% figure is well below that which the Supreme Court approved in *Mahan* based on Virginia's policy of respecting subdivision boundaries, a rationale which, *inter alia*, the State advances here. In any event, the petitioners have not challenged the subdistricts in the Governor's plan as unconstitutionally unequal.

**16.** Skinner and Weiner also argue that the Governor's plan does not legitimately reflect state policy considerations in deviating from population equality. This is because, they assert, the Governor's plan was developed by the GRAC, "an ad hoc committee without legal foundation," and became law only upon failure of the General Assembly to enact an alternative plan. Skinner and Weiner claim that there was no "consistently applied legislative policy" to justify departures from population equality.

This claim is erroneous. When the General Assembly passes a bill which becomes law, the people of Maryland have articulated a legitimate state policy through their duly elected officials. That is no less true where, as here, the constitution specifies that the Governor shall develop the law in the first instance, which the General Assembly can then reject or endorse through its own action or inaction.

Dembrow asserts that, though the Supreme Court's cases establish that a maximum deviation under 10% does not make out a *prima facie* case of voting discrimination, we must examine the deviations in the Governor's plan for possible equal protection violations anyway. We do not so read the Court's rulings. *Brown, supra,* specifies that deviations under 10% do not ordinarily require justification by the State. 462 U.S. at 842, 103 S.Ct. at 2695–96. Dembrow's assertion that the districts could have been made more equal is simply irrelevant. The Governor's plan passes federal constitutional muster.

 Before turning to the state constitution, however, both Dembrow and Skinner/Weiner make an additional claim that must be addressed. They argue that the Governor's plan intentionally created population disparities between districts to discriminate against certain regions in the State and in favor of others. Specifically, they point out that of the ten smallest districts in the Governor's plan (those with fewer than 97,000 persons), eight lie either wholly or partly in Baltimore City, and a ninth lies close by in Baltimore County. They assert that even though the population of Baltimore City is smaller than that of Montgomery County, the City "controls" eight senators, while Montgomery County only "controls" seven. This leads the petitioners to allege that the Governor's plan intentionally deviates from population equality to discriminate against Montgomery County and in favor of Baltimore City. Skinner and Weiner present a statistical analysis to this effect by petitioner Weiner, a professional statistician.

We agree with the petitioners that the Governor's plan appears to favor Baltimore City. By packing that region with districts containing barely more than the minimum constitutionally permissible population, the Governor's plan appears to systematically afford the City the maximum number of representatives in the legislature as its population can support. However, we are not prepared to say that this favorable result for the City rises to the level of a constitutional violation.

By its very name, the one person, one vote principle affords the right of equal representation to persons as opposed to regions. As the Special Master observed, "since the time of *Reynolds* . . ., it is *people,* not *territory,* which are to be represented in the General Assembly." (Emphasis in original.) As long as the population disparities between legislative districts adhere to the requirements of *Reynolds* and its progeny—*i.e.* as long as maximum deviations are under 10%—disparities in the number of representatives from the various regions or political subdivisions in the State are *prima facie* immaterial.

Possibly, there may be room under *Reynolds* and its progeny for a plaintiff to overcome the "10% rule," if the plaintiff can present compelling evidence that the drafters of the plan ignored all the legitimate reasons for population disparities and created the deviations *solely* to benefit certain regions at the expense of others.[17] We need not consider this question, because such is not the case here. Petitioners offer no evidence, other than the Governor's plan itself, that the plan discriminates against certain regions. While the plan does appear to favor Baltimore City, the petitioners cannot demonstrate that the disparities in the plan did not result from the GRAC's effort to accommodate legitimate policy concerns in redistricting.

More importantly, the petitioners cannot show that the Governor's plan unconstitutionally harms other regions in favoring the City. The petitioners claim that the plan discriminates against Montgomery County, but this is not true. Of the ten largest districts in the plan (those with more than

---

**17.** Such a showing would be difficult. As discussed earlier, a state may deviate from pure population equality among districts for numerous reasons: to make districts compact, to make districts contiguous, to respect the boundaries of political subdivisions and municipalities, to preserve the cores of prior districts, to avoid contests between incumbents, or to further any other rational state policy. *Reynolds,* 377 U.S. at 578–79, 84 S.Ct. at 1390; *Karcher, supra,* 462 U.S. at 740, 103 S.Ct. at 2663.

105,695 people), only one lies in Montgomery County; the rest are scattered throughout the State. With a population of 757,027 people, Montgomery County should expect to have 7.44 senators. In fact, the County will control almost precisely that number; under the plan, Montgomery County residents will elect 7 senators alone and will share an eighth with Howard County.[18]

Had the petitioners shown that the GRAC's only concern in creating population deviations in the Governor's plan was to promote the interests of Baltimore City, a different result might obtain.[19] Had the plan systematically discriminated against one region in favoring the City, a different result might also obtain. As it is, the Governor's plan complies with

**18.** The dissent suggests that the Governor's plan "obviously discriminates against ... Montgomery County." It alleges that, although Montgomery County's population exceeds Baltimore City's, "the voters of Baltimore City elect 8 Senators and 24 Representatives, while the voters of Montgomery County elect only 7 Senators and 21 Representatives."

The dissent achieves this result by selectively manipulating all cross-jurisdictional districts into Baltimore City and out of Montgomery County. In fact, Baltimore City residents will *alone* elect only 5 senators (in districts 40, 41, 43, 44, and 45) and 17 delegates (in those districts plus subdistrict 47A). City residents will largely control the election of a sixth senator and three more delegates in district 46, though Baltimore County residents will have some input into that election. Contrary to the dissent's implication, however, City residents will not "elect" a seventh and eighth senator and several more delegates. In districts 42 and 47, City residents will only *share* in the senatorial elections with County residents, who have enough voting strength in each district to alter the outcome.

Likewise, Montgomery County residents will not elect "only 7 Senators and 21 Representatives." They will *alone* elect 7 senators and 22 delegates (in districts 14A, 15, 16, 17, 18, 19, 20, and 39), and they will contribute significantly to the election of an eighth senator (district 14) and, less significantly, to the election of two more delegates (district 14B).

**19.** Such a showing, however, would still leave the interesting question, which we need not address, whether it is a "rational state policy" under *Reynolds* to maximize the legislative representation of a region, such as Baltimore City, with waning political clout but urgent political needs, so long as no other region in the State is seriously and disproportionately underrepresented as a result.

the Fourteenth Amendment.[20]

### (b) The State Constitution

Skinner and Weiner also challenge the Special Master's finding that the Governor's plan does not violate the state constitutional requirement that districts be "of substantially equal population." Dembrow, impliedly, does likewise, when he suggests that "[i]t is time for the Maryland Court of Appeals to review the 10% rule, and to impose stricter standards for legislative equalization in our state." We have previously reserved the question whether the state constitution imposes a tougher standard of population equality than the Fourteenth Amendment. *In re Legislative Districting, supra,* 299 Md. at 683, n. 17, 475 A.2d 428. We must address it now.

As the Special Master explained, the "substantially equal population" language of Article III, § 4, which was adopted in 1972, was derived from identical language in § 3.04 of the proposed Maryland Constitution of 1968. The discussions in the Constitutional Convention of 1967–68 which led to the development of § 3.04 are therefore relevant in interpreting the "substantially equal" phrase.

Initially, the Constitutional Convention Commission proposed in its draft constitution that legislative districts "shall be as nearly equal as practicable." However, the Committee on

---

**20.** The dissent expends much energy trying to evade the "10% rule," first calling it "dictum," then apparently conceding its binding nature, asserting that it only establishes the threshold for *prima facie* discrimination. The dissent suggests that when maximum population deviations in a redistricting plan fall below 10%, a plaintiff must only show "more than the mere percentage deviation" in order to shift the burden to the State to justify the deviations. To adopt the dissent's proposal would ensure that every legislative redistricting plan would languish in protracted litigation. Disgruntled opponents of any redistricting scheme can invariably offer something suggesting ill will by district planners; thus, the dissent's proposal would undermine *Brown's* rule that maximum deviations under 10% will not "ordinarily" require justification by the State. Only when a plaintiff can show that no legitimate policy concerns contributed to population deviations should the burden shift to the State to justify those deviations.

the Legislative Branch substituted the phrase "substantially equal" when it brought the provision to the floor of the Convention. It explained:

> The Constitutional Convention Commission draft uses the language "as nearly equal as practicable." This language might be construed instead to mean "as equal as possible." Any language that might be construed as requiring districts to be "as nearly equal as possible" should be avoided. The reason is that perfect arithmetic equality *is* possible—all the way down to percentage deviations of less than one percent. Under such a standard many reasonable and "substantially equal" plans could be challenged and upset merely by showing that a further "tinker" could reduce the arithmetic deviation by an additional percentage point or two. Such nit-picking invalidations of carefully devised plans have occurred in a number of states where lower courts have used the "as nearly equal as possible" arithmetic standard.
>
> To avoid this possibility, the Committee recommends that the phrase "substantially equal" be used instead of "as nearly equal as practicable" in the new Constitution.
>
> It should be kept clearly in mind, however, that the Committee on the Legislative Branch intends "substantially equal" to mean that "the difference between the populations of the largest and smallest districts in the State shall not exceed fifteen percent of the mean population of all districts." The committee intends that differences greater than fifteen percent should be tolerated only in those few rare and exceptional cases where natural boundaries or existing political subdivision lines make variance from the normal fifteen percent standard reasonable.

Committee Memorandum LB at 2–3 (emphasis in original).

 This passage indicates that the original drafters of the "substantially equal population" language in the Maryland Constitution contemplated that the district planners should have a 15% degree of flexibility from perfect population equality. While we do not necessarily embrace such a "15% rule" under the Maryland Constitution, we do hold that Article III,

§ 4 does not impose a stricter standard for population equality than the 10% rule imposed by the Fourteenth Amendment.

In *Reynolds,* the Supreme Court instructed states to construct their legislative districts "as nearly of equal population as is practicable." 377 U.S. at 577, 84 S.Ct. at 1390. Then, without rejecting that standard, the Court built a 10% degree of flexibility into it. By contrast, the Maryland Constitution explicitly rejected the "as nearly equal as practicable" formulation in favor of the looser "substantially equal" provision. We will not now hold that the looser provision allows less flexibility than the tighter one which Maryland rejected. Nor do we believe that the drafters of the Maryland Constitution intended to forfeit the flexibility which the *Reynolds* Court afforded the states for the purpose of accommodating important redistricting concerns.

We agree with the Special Master that the Governor's plan satisfies both the federal and state constitutional requirements as to population equality.

### (5) First Amendment

Skinner and Weiner claim that the population disparities among the legislative districts in the Governor's plan also violate their First Amendment right to freedom of speech. They argue that by assigning them fewer representatives per resident than other areas, the Governor's plan dilutes their vote—and hence their "political expression"—relative to other Maryland citizens. The Special Master rejected this assertion "as simply another way of framing the contentions under the 14th Amendment" with regard to population equality. The Special Master was correct.

For nearly thirty years now since *Reynolds* the Supreme Court has regularly reiterated that the Fourteenth Amendment permits states, in districting their legislatures, to deviate from pure equality of population between districts in order to accommodate important state interests. Thus, we do not believe that the First Amendment has ever forbidden states that latitude. There is no case holding that the First Amend-

ment visits greater scrutiny upon a districting plan than the Fourteenth. Rather, the cases uniformly counsel the opposite. *See e.g. Anne Arundel County, supra,* 781 F.Supp. at 401, *aff'd,* —— U.S. ——, 112 S.Ct. 2269, 119 L.Ed.2d 197 *Badham v. Eu,* 694 F.Supp. 664, 675 (N.D.Ca.1988), *aff'd,* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989); *Washington v. Finlay,* 664 F.2d 913, 927–28 (4th Cir.1981).

There is no merit in petitioners' First Amendment claim.

### (6) Voting Rights Act

Petitioners Dembrow and Rynd contend that the Governor's redistricting plan runs afoul of the federal Voting Rights Act, 42 U.S.C. §§ 1971, 1973 *et seq.*[21] Dembrow argues that

one or more single-member districts could be formed in the southeastern portion of Montgomery County in which caucasians could constitute less than a majority of the total census counts, thereby making it easier and more attractive for minority candidates of Asian, African–American or Hispanic extraction fairly and fully to compete for public office in the state legislature.

Rynd asserts that several "minority" districts in the Governor's plan do not in fact contain sufficiently large minority populations to ensure the election of minority representatives. Rynd also laments the fact that the Governor's plan did not create more minority seats in Baltimore City. The Special Master rejected these claims. We do too.

In an effort to eradicate persistent assaults on the ability of minorities to vote, Congress enacted the sweeping Voting Rights Act of 1965. Congress' goal was to finally and firmly enforce the Fifteenth Amendment's guarantee that "[t]he right of citizens of the United States to vote shall not be

---

**21.** Some other Marylanders, including the NAACP in Baltimore, feel the same way and have taken their complaint to the United States District Court for the District of Maryland. That case is currently pending.

denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude."

The Voting Rights Act has two main provisions. Section 2 proscribes states and their subdivisions from enforcing any qualification, prerequisite, or practice on the right to vote which undermines minority voting strength. 42 U.S.C. § 1973. Section 5 prevents certain states and subdivisions from *changing* their election laws in a manner detrimentally affecting minority voting power. 42 U.S.C. § 1973c. Thus, § 5 applies only to certain "covered" jurisdictions having a history of discrimination, which must "preclear" any changes in their election laws with either the Attorney General or the United States District Court for the District of Columbia. Since neither Maryland nor any of its subdivisions is a covered jurisdiction, *see* the appendix to 28 C.F.R. § 51 (1990), we deal here only with § 2 of the Act. As originally adopted, § 2 provided in full: "No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." This language, which mirrored the Fifteenth Amendment, did not appear to reach state and local practices having only an *unintended* detrimental impact on minority voting ability. However, the Supreme Court in *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), held that practices which, in the totality of the circumstances, infringed minority electoral participation and success could not survive review under either the Fifteenth Amendment or the equal protection clause of the Fourteenth. Lower federal courts interpreted this to mean that, to prevail under the Voting Rights Act, a minority need only show that the challenged practice or system had a discriminatory *effect* on minority voting strength. *See e.g. Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd sub nom. East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam).

But in *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), the Supreme Court declared that *White*

had actually required a showing of discriminatory *intent* to prevail in a § 2 claim. This ruling prompted Congress in 1982 to amend § 2 to make it conform to the "effects" test that had been widely understood as the law in the pre-*Bolden* period. Thus, § 2 now prohibits any practice "which *results* in a denial or abridgement of" minority voting rights, and a new subsection (b) codifies the original connotation of *White* that a minority need only show, in the totality of the circumstances, that it has less opportunity for electoral participation and success in order to establish a Voting Rights Act violation.[22]

The Supreme Court delivered its major exegesis of the amended § 2 in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). In *Gingles,* the Court found that the important question in Voting Rights actions "is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" 478 U.S. at 44, 106 S.Ct. at 2763, quoting the Senate Judiciary Committee majority Report accompanying the § 2 amendments (S.Rep.) at 28. To answer this question, courts must look to

---

**22.** Section 2, as amended, provides in full:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

"objective factors," including but not limited to those which the Senate deemed specifically probative of a § 2 violation:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

"2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

"3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

"4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

"5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

"6. whether political campaigns have been characterized by overt or subtle racial appeals;

"7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

"Additional factors that in some cases have had a probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."

478 U.S. at 36–37, 106 S.Ct. at 2759, quoting S.Rep. at 28–29.

Despite the number and flexibility of these "Senate factors" which could show a § 2 violation, the Court recognized three limits on the process:

First, electoral devices, such as at-large elections, may not be considered *per se* violative of § 2.... Second, the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation. Third, the results test does not assume the existence of racial bloc voting; plaintiffs must prove it.

478 U.S. at 46, 106 S.Ct. at 2764 (citations omitted).

The Court then turned to the specific question of multimember districts. "Multimember districts and at-large election schemes ... are not *per se* violative of minority voters' rights." 478 U.S. at 48, 106 S.Ct. at 2765. The Court found that multimember districts "generally will not impede the ability of minority voters to elect representatives of their choice," except through the confluence of three specific factors:

First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.

478 U.S. at 50–51, 106 S.Ct. at 2766.

Finally, the Court addressed the merits of the case before it and, except as to one district, affirmed the lower court's determination that several districts in a North Carolina reapportionment plan violated the Voting Rights Act. The Court has twice recently reaffirmed the principles it developed in *Gingles. Growe v. Emison*, ⸺ U.S. ⸺, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993); *Voinovich, supra*, ⸺ U.S. ⸺, 113 S.Ct. 1149. In *Growe*, the Court held that a plaintiff must make the same three showings to challenge a single-member districting scheme as are necessary to challenge a multimember scheme. ⸺ U.S. at ⸺, 113 S.Ct. at 1084.

*Gingles* immediately disposes of Dembrow's claim. He argues that the Voting Rights Act mandates the creation of at

least one minority single-member district in southeastern Montgomery County. He concedes, however, that in that region "neither race nor racial polarization have contributed to previous elective outcomes, ... nor have the two disparate racial and cultural communities otherwise acted in the past as a single or unified political bloc." The effect of this concession is clear. As the foregoing discussion illustrates, *Gingles* requires—both generally and in the specific context of multi-member districts—that plaintiffs in § 2 actions prove that the minority groups in question are politically cohesive and vote as a bloc. Dembrow, therefore, has failed to state even a *prima facie* violation of the Voting Rights Act.

Rynd's claims, while more difficult, are also without merit. He says that the 10th and the 43rd districts in the Governor's plan are not viable minority districts because they contain insufficiently large black populations to create "safe" black seats. Rynd also urges that district 47A in the Governor's plan, a two-member district with a 32.6% black population, should have been subdivided to ensure at least one minority single-member district. Finally, Rynd complains generally that the Governor's plan does not create any single-member districts to promote minority representation in Baltimore City.

The 10th district in the Governor's plan has a 62.8% black population, while the 43rd district is 57.9% black. Rynd maintains that these percentages are inadequate to assure minority predominance. He is mistaken. As a matter of law, there is no established minority population figure above 50% which is deemed to ensure a "safe" minority district. *United Jewish Organizations v. Carey*, 430 U.S. 144, 162, 97 S.Ct. 996, 1008, 51 L.Ed.2d 229 (1977). Rather, the appropriate percentage will turn on minority voting patterns and cohesiveness. Federal courts have frequently ordered the creation of "minority" districts in which racial minorities constitute barely more than a majority of the population. *See e.g. McGhee v. Granville County, N.C.*, 860 F.2d 110 (4th Cir.1988) (51.8% black voting age population sufficient); *Jordan v. Winter*, 604 F.Supp. 807 (N.D.Miss.1984), *aff'd*, 469 U.S. 1002, 105 S.Ct. 416, 83 L.Ed.2d 343 (1984) (52.8% total black population

sufficient); *Smith v. Brunswick County, Va., Bd. of Sup'rs,* 984 F.2d 1393, 1401 (4th Cir.1993) ("when a racial (or language) minority becomes the voting majority in a single-member district, it is empowered with the vote in that district"); *Burton v. Sheheen,* 793 F.Supp. 1329, 1354 (D.S.C. 1992) ("a district may be considered a black opportunity district if the percentage of the black voting age population is greater than 50 percent").

Moreover, the 10th and 43rd districts are viable minority districts as a matter of fact. The 10th district is not a remnant of any existing legislative district; it is a wholly new creation, designed specifically to ensure regional compliance with the Voting Rights Act. As such, the 10th will have no white incumbent in the 1994 elections, improving the possibility that its minority residents will be able to elect a senator and delegates of their choice. The 43rd, meanwhile, contains two incumbent black delegates (one of whom currently plans to seek the senatorial seat), which increases the prospect of black representatives following the 1994 elections. *See Burton, supra,* 793 F.Supp. at 1355 (presence of black incumbent enhances effectiveness of voting rights district). Also, a precinct analysis by the Planning Office shows that Jesse Jackson would have carried both the 10th and the 43rd districts in 1988.

Rynd's complaints that district 47A, and the City generally, should have been subdistricted to ensure further minority representation also fail. As noted earlier, *Gingles* instructs that multi-member districts are not *per se* violative of the Voting Rights Act. 478 U.S. at 48, 106 S.Ct. at 2765. Rynd nevertheless insists that district 47A, a two-member district with a 32.6% black population, could have been subdivided to create a majority black single-member district, and that the Governor's plan fails to employ any single-member districts in Baltimore City to promote minority representation.

However, as *Gingles* makes clear, Rynd must do more than simply allege that a minority district could have been created to establish a § 2 violation. Rynd must show that the

32.6% black population in district 47A is sufficiently compact to form a majority in a single-member district, that it is politically cohesive, and that the white voters in district 47A vote sufficiently as a bloc to enable them to defeat the minority's preferred candidate. Rynd makes none of these showings, either with respect to district 47A or any other potential single-member districts in the City. The Voting Rights Act simply does not require a state to create every conceivable minority district. *Turner v. State of Ark.*, 784 F.Supp. 553, 573 (E.D.Ark.1991), *aff'd*, —— U.S. ——, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992) (§ 2 is not an affirmative action statute, and a state need not enact a districting plan that maximizes black political power or influence); *Burton, supra,* 793 F.Supp. at 1362 ("[D]istrict by district enhancement [of majority black districts] is not constitutionally mandated.").

We agree with the Special Master that the Governor's plan does not violate the Voting Rights Act.

### (7) Partisan gerrymandering

 Petitioners Rynd and Dembrow asserted before the Special Master that the Governor's plan engages in impermissible partisan gerrymandering. Rynd argued that district 9B in Baltimore County evinced such gerrymandering because, as a single-member district, it contains a slightly higher proportion of registered Democrats than district 9 as a whole. Dembrow argued that the plan gerrymandered districts in Montgomery County to protect certain incumbents and to harm the prospects of other potential candidates. The Special Master rejected these claims. So do we.

Before examining the petitioners' specific claims, we mention that general principles of legislative apportionment will usually cast doubt upon claims that a redistricting plan produces unfair political results. In *Gaffney v. Cummings, supra,* the Supreme Court observed that "[p]olitics and political considerations are inseparable from districting and apportionment.... The reality is that districting inevitably has and is intended to have substantial political consequences." 412 U.S.

at 753, 93 S.Ct. at 2331. We have noted that "the districting process is a political exercise for determination by the legislature and not the judiciary." *In re Legislative Districting, supra,* 299 Md. at 688, 475 A.2d 428.

Dembrow says that the Governor's plan gerrymanders districts in Montgomery County to protect incumbents. In *Karcher v. Daggett, supra,* 462 U.S. 725, 103 S.Ct. 2653, the Supreme Court specified that avoiding contests between incumbents is a permissible reason for states to deviate from creating districts with perfectly equal populations. *Id.* at 740, 103 S.Ct. at 2663. Obviously, it is therefore permissible for states to consider incumbents in crafting districts in the first place. Dembrow even concedes that "[i]ncumbent residency is a factor which may legitimately be considered in redistricting negotiations and plans." Thus, his claim that the Governor's plan constructs districts with a view toward protecting incumbents states no redressable wrong.

Dembrow's and Rynd's assertions that the plan gerrymanders district 9 and several Montgomery County districts to undermine certain candidacies, while legally redressable, are without merit. On the same day it handed down *Gingles,* the Supreme Court issued its major explication of the question of political gerrymandering in *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). In *Davis,* only six justices found the question of partisan political gerrymandering to represent a justiciable controversy. Of these six, a four-justice plurality held that while the equal protection clause proscribes voting discrimination on the basis of political affiliation, plaintiffs must carry an extremely heavy burden to show a discriminatory effect. The Court wrote:

[U]nconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group's influence on the political process as a whole.... [E]ven if a state legislature redistricts with the specific intention of disadvantaging one political party's election prospects, we do not believe that there has been an unconstitutional discrimination against members of that party unless the redistricting does in fact

disadvantage it at the polls.... The mere lack of control of the General Assembly after a single election does not rise to the requisite level.

478 U.S. at 132, 139–40, 106 S.Ct. at 2810, 2814. The plurality's rationale for creating such a high threshold was that "a court cannot presume ... that those who are elected will disregard the disproportionately underrepresented group." 478 U.S. at 132, 106 S.Ct. at 2810.

*Davis* quickly lays to rest the petitioners' gerrymandering claims. Neither Dembrow nor Rynd has come close to making the requisite showing that the districts in question will "consistently degrade" one party's or group's electoral prospects. *Davis* establishes that, absent flagrant partisan abuse of the redistricting process, the political consequences of that process will remain in the hands of the legislature and not the judiciary. The petitioners' partisan gerrymandering claims lack merit.

### (8) Due regard for boundaries

Lastly, all of the petitioners attack the Governor's plan as violative of the command in Article III, § 4 of the State Constitution that "[d]ue regard shall be given to natural boundaries and the boundaries of political subdivisions." In various guises, the petitioners complain that too many districts in the Governor's plan breach the Baltimore City/Baltimore County boundary.[23] Some of the petitioners presented alternative districting plans to the Special Master which contained fewer breaches of the City/County border. The Special Mas-

---

**23.** Levin and Rynd, who reside in Baltimore County, argue that the Governor's plan enhances the City's legislative representation at the expense of Baltimore County by creating City-controlled "crossover" districts. Dembrow and Skinner/Weiner, who reside in Montgomery County, generally aver that the Governor's plan unfairly favors Baltimore City. These latter petitioners, however, do not and cannot allege that the Governor's plan violates the "due regard" provision in the Montgomery County area, for the plan breaches the Montgomery County border in only one place. This breach is necessitated by the fact that Montgomery County must share a district with another jurisdiction to achieve its ideal number of representatives.

ter said that the "due regard" question is "by far the thorniest issue before the Court," but he proceeded to reject the petitioners' assertions. We agree with the Special Master—on both points.

We have not before had reason to consider extensively the "due regard" provision, which arises exclusively under the State Constitution. In *Reynolds, supra,* 377 U.S. 533, 84 S.Ct. 1362, the Supreme Court laid the foundation for Maryland's "due regard" provision, and its counterpart provisions in other states, by allowing that attention to subdivision boundaries is a legitimate reason for states to deviate from creating districts with perfectly equal populations. The Court wrote:

> A consideration that appears to be of more substance in justifying some deviations from population based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions.... Local government entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering.

377 U.S. at 580–81, 84 S.Ct. at 1391.

In the 1982 redistricting litigation, we offered another justification for Maryland's "due regard" provision: "to preserve those fixed and known features which enable voters to maintain an orientation to their own territorial areas." *In re Legislative Districting, supra,* 299 Md. at 681, 475 A.2d 428. While we noted that "the 'due regard' requirement is of mandatory application," *Id.,* we warned that "by its very verbiage it would appear to the most fluid of the constitutional components outlined in § 4." *Id.* We also cautioned that it is "a plain fact" that the § 4 requirements—contiguity, compactness, substantially equal population, and "due regard" for

boundaries—will "tend to conflict in their practical application." *Id.*

In the instant case, five legislative districts in the Governor's plan—8, 10, 42, 46, and 47—cross the Baltimore City/Baltimore County border. In districts 8 and 10, a majority of the population resides in Baltimore County, while the City dominates districts 42, 46, and 47. District 47, however, is subdistricted; 47A is a two-member district lying wholly within Baltimore City, while 47B is a single-member district wholly within the County.

At the outset, we note that, contrary to the suggestions of some petitioners, the breaches of the City/County boundary in the Governor's plan do not manifestly harm the County. Of the five districts which cross the border, two favor the City, two favor the County, and the fifth, though it may favor the City, is subdistricted to assure that the County controls at least one delegate. Moreover, the County's population of 692,134 persons suggests that it should ideally contain 6.8 legislative districts. In fact, the County contains three districts completely (7, 9, and 11), the overwhelming majority of three more districts (6, 8, and 10), and one-third to one-half of three more districts (12A, 42, and 47B). A small portion of district 46 also spills over into Baltimore County. These figures indicate that the County will effectively control at least 6.8 legislative districts in the 1994 elections, if not more. All things considered, Baltimore County fared well under the Governor's redistricting plan.

Nevertheless, the petitioners complain that the Governor's plan failed literally to heed the mandatory "due regard" requirement by breaching the City/County boundary in so many places. They point to the opening remarks of the GRAC chairman at the final public hearing, when he announced that the GRAC had designed districts, *inter alia*, to:

4) Recognize communities of interest—where districts cross local jurisdictional lines and to group communities that share interests. . . .

* * * * * *

6) To support regional interests through the intra-regional sharing of districts.

See Part I, *supra.* Petitioners argue emphatically that these considerations were improper, given our opinion in the 1982 litigation that

[t]he ["due regard"] provision does not, in our view, encompass protection for a concept as nebulous and unworkable as "communities of interest," involving as it does concentrations of people sharing common interests. We think it apparent that the number of such communities is virtually unlimited and no reasonable standard could possibly be developed to afford them recognition in the formulation of districts within the required constitutional framework.

*In re Legislative Districting, supra,* 299 Md. at 692–93, 475 A.2d 428. Petitioners assert that the chairman's comments indicate that the GRAC deliberately jettisoned the mandatory "due regard" provision in favor of improper "communities of interest" and "regional interests" criteria. Rynd calls the chairman's comments a "smoking gun," and says that "due regard" is the issue to which all others in this case are subsidiary.

We agree that the GRAC appears to have relied to some extent on improper non-legal criteria in formulating the City/Baltimore County region of the Governor's plan. We explicitly stated in 1982 that "communities of interest" are an unworkable basis on which to apportion districts. While the Governor's plan enjoys a "presumption of validity," *In re Legislative Districting,* 299 Md. at 688, 475 A.2d 428, that presumption may be overcome when compelling evidence demonstrates that the plan has subordinated mandatory constitutional requirements to substantial improper alternative considerations. Here, the GRAC chairman publicly announced that the GRAC created districts to "cross local jurisdiction lines and to group communities that share interests," thereby possibly diluting the full application of the "due regard" provision. Thus, the Governor's plan in the City/Baltimore County region comes perilously close to running afoul of Article III, § 4.

The danger lurking in legislative districts which cross jurisdictional boundaries, of course, is that representatives from those districts may face conflicting allegiances as to legislative initiatives which benefit one of their constituencies at the expense of the other. As discussed above, the five districts which breach the City/County boundary are 8, 10, 42, 46, and 47. Districts 8 and 46 lie almost wholly within, respectively, Baltimore County and Baltimore City, with minimal overlap into the other jurisdiction. District 47 is subdistricted, with a two-member district in the City and a single-member district in the County. Thus, as to these three districts, the danger of divided loyalties is minimized, because no legislator other than the senator from district 47 will represent numerous persons in two different jurisdictions. District 10, meanwhile, is a minority district whose creation was mandated by the Voting Rights Act.

That leaves district 42, which is probably the most egregious district in the Governor's plan. It lies approximately half in northwest Baltimore City and half in Baltimore County. The encroachment of district 42 into Baltimore County will force petitioners Levin and Rynd to vie with each other for re-election to the House of Delegates in a newly drawn district 11. District 42's overlap into Baltimore County also has the effect of dividing the tightly-knit Jewish community in the Pikesville area between three different legislative districts.

As we observed in 1982, the constitutional requirements for legislative districting tend to conflict with one another. When they do, the "due regard" provision, as the "most fluid" of the requirements, will often be the first to yield. Here, the due regard provision *vis a vis* district 42 must mesh with the other constitutional requirements which factored into the development of the plan as a whole. And while the fact that district 42 splits the Jewish community may be regrettable, regard for that "community of interest" cannot overcome constitutional considerations.

Taking into account the presumption of the validity of the Governor's plan, we agree with the Special Master that the

plan does not unconstitutionally transgress the "due regard" provision.

### III

For all the foregoing reasons, we conclude that the Governor's plan for redistricting the General Assembly satisfies all constitutional and statutory requirements and was therefore validly enacted.

ELDRIDGE, Judge, dissenting:

The majority today acknowledges that there are problems with the legislative redistricting plan. It states (331 Md. 574, 614, 629 A.2d 646, 666):

"the GRAC appears to have relied to some extent on improper non-legal criteria in formulating the City/Baltimore County region of the Governor's plan.... The GRAC chairman publicly announced that the GRAC created districts to 'cross local jurisdiction lines and to group communities that share interests,' thereby possibly diluting the full application of the 'due regard' provision. Thus, the Governor's plan in the City/Baltimore County region comes perilously close to running afoul of Article III, § 4."

The majority also states that "the Governor's plan appears to favor Baltimore City[,] [b]y packing that region with districts containing barely more than the minimum constitutionally permissible population." 331 Md. at 596, 629 A.2d at 657. Yet, the majority holds that it is "not prepared to say that this favorable result for the City rises to the level of a constitutional violation." 331 Md. at 596, 629 A.2d at 657. The plan was deliberately drawn to ignore the boundaries of subdivisions in certain areas, regard for which is a constitutional imperative. Moreover, the plan deviates from equality of population for a reason other than the reason which has been accepted by the Supreme Court for such deviation—respect for the boundaries of subdivisions. The plan thus transgresses federal and state constitutional requirements regarding legislative districting in two critical, interrelated ways. While the majority holds that

the plan is only "perilously close" to the edge of unconstitutionality, I believe that it is over the edge.[1]

## I.

The Maryland Constitution mandates that a redistricting plan for the General Assembly conform to certain specified requirements. Article III, § 4, provides as follows:

"Each legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population. Due regard shall be given to natural boundaries and the boundaries of political subdivisions."

Article III, § 5, states that the Governor's "plan shall conform to Sections 2, 3 and 4 of this Article." The constitutional language requiring due regard for natural boundaries and political subdivisions was adopted by Ch. 363 of the Acts of 1972 and was ratified on November 7, 1972. Rather than accept these mandates for preparing the Governor's redistricting plan, the GRAC announced that the plan had been drafted based upon the following principles (Remarks of GRAC Chair at beginning of December 10, 1991, hearing):

"1) [To r]epresent people fairly—Legislative districts fall within 5 percent of the ideal population of 101,733.

2) To be compact.

3) To provide minority voters the opportunity to elect candidates of their choosing.

4) [To r]ecognize communities of interest—where districts cross local jurisdictional lines and to group communities that

---

1. Since I believe that the redistricting plan is invalid on two grounds, namely its failure to give due regard to political subdivision boundaries and its population deviations, and that the plan should be modified to rectify its deficiencies in both of these areas, I need not and do not express any opinion concerning the other grounds on which the plan was challenged. If the plan were modified to rectify the deficiencies regarding political subdivision boundaries and population deviations, some of the other challenges might disappear or might be of a different nature.

share interests (interests such as shopping centers, utility systems, transportation, and other community facilities).

5) To keep municipalities whole where possible.

6) To support regional interests through the intra-regional sharing of districts."

It is apparent from these remarks of the Chairman, as well as from the numerous times that the Plan crossed political subdivision lines, that the constitutional requirement of due regard for the boundaries of political subdivisions was ignored in favor of the promotion of "regional interests." As we stated in *In re Legislative Districting*, 299 Md. 658, 681, 475 A.2d 428, 439 (1982), "the 'due regard' requirement is of mandatory application...."

The majority attempts to dilute this constitutional imperative by stating that the due regard provision is the "most fluid" of the constitutional guidelines and therefore "will often be the first to yield." 331 Md. at 615, 629 A.2d at 667. The majority's analysis is disingenuous. The due regard requirement in this case has not yielded to other constitutional imperatives such as substantial equality of population, contiguity or compactness. This constitutional mandate has yielded to a nonconstitutional program of attempting to promote "communities of interests" and supporting "regional interests." These considerations are not set forth in Article III of the Maryland Constitution. To the contrary, they may be antithetical to the "due regard" requirement mandated by the Constitution. Moreover, as the majority recognizes, this Court "explicitly stated in 1982 that 'communities of interest' are an unworkable basis on which to apportion districts." 331 Md. at 614, 629 A.2d at 666. It is certainly possible that the due regard requirement may have to yield to other constitutional mandates, including federal law made supreme by the Supremacy Clause of the Constitution of the United States [2]

---

**2.** Article VI, cl. 2, of the Constitution of the United States provides:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the

and Art. 2 of the Maryland Declaration of Rights.[3] It is impermissible, however, to subjugate a constitutional mandate to lesser principles. The GRAC's deliberate decision to ignore the boundaries of political subdivisions for a reason other than to conform to constitutional principles or federal law renders the legislative redistricting plan invalid.

The majority's dismissal of the requirement of due regard for political subdivisions is unsupported by the history and reality of governance in this State. Earlier legislative districting plans have considered the counties and Baltimore City to be the primary element in apportionment, and have only crossed subdivision boundaries when necessary to achieve population equality. *See* Report to the Governor of Maryland by the Commission to Study Reapportionment of the General Assembly (January 31, 1964) (assuming that all representation is determined with reference to subdivision boundaries); Final Report of the Committee on More Equitable Representation in the General Assembly of Maryland (January 15, 1960) (same).

The political subdivisions have always been central to our system of state government. From the early history of Maryland, political subdivisions have played a critical role. *See generally* Matthew P. Andrews, *History of Maryland,* 617 (1929) ("In the matter of representation Maryland has been likened to a 'confederacy of counties,' or a federated republic—the counties and the city of Baltimore ... being comparable to the states in the Federal Union"); Theodore J. Maher,

---

supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

**3.** Article 2 of the Maryland Declaration of Rights states:
"The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, and all Treaties made, or which shall be made, under the authority of the United States, are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding."

*State–County Relations in Maryland,* 312–319 (1971) (discussing the importance of county governments within the organization of the State). *See also Hughes v. Maryland Committee,* 241 Md. 471, 498–509, 217 A.2d 273, 289–295, *cert. denied,* 384 U.S. 950, 86 S.Ct. 1569, 16 L.Ed.2d 547 (1966) (Barnes, J., dissenting) (discussing at length the importance of the political subdivisions). Unlike many other states, Maryland has a small number of basic political subdivisions: twenty-three counties and Baltimore City.[4] Thus, "[t]he counties in Maryland occupy a far more important position than do similar political divisions in many other states of the union." 241 Md. at 499, 217 A.2d at 290, quoting the Maryland Geological Survey, "The Counties of Maryland, Their Origin, Boundaries and Election Districts," 419 (1907).

The Maryland Constitution itself recognizes the critical importance of counties in the very structure of our government. *See, e.g.,* Art. I, § 5; Art. III, §§ 45, 54; Art. IV, §§ 14, 19, 20, 21, 25, 26, 40, 41, 41B, 44, 45; Art. V, §§ 7, 11, 12; Art. VII, § 1; Art. XI; Art. XI–A; Art. XI–B; Art. XI–C; Art. XI–D; Art. XI–F; Art. XIV, § 2; Art. XV, § 2; Art. XVI, §§ 3, 4, 5; Art. XVII, §§ 1, 2, 3, 5, 6. After the State as a whole, the counties are the basic governing units in our political system. Maryland government is organized on a county-by-county basis. Numerous services and responsibilities are now, and historically have been, organized at the county level.[5]

---

**4.** Under Art. XI–A of the Maryland Constitution, Baltimore City is the equivalent of a home rule county. Consequently, general references to "counties" in this opinion will include Baltimore City unless the context indicates otherwise.

**5.** Many of the most important functions of government in Maryland are performed by counties. Maryland's public schools are organized at this local level, with one school board for each county and Baltimore City. The counties and Baltimore City operate libraries, hospitals, clinics, jails and parks. Other functions carried out at the county level include zoning and land use planning, public works projects, health inspections, building inspections, and sanitation services. The local governments provide fire and police protection. Real estate taxes are largely determined by the counties and Baltimore City.

The boundaries of political subdivisions are a significant concern in legislative redistricting for another reason: in Maryland, as in other States, many of the laws enacted by the General Assembly each year are public local laws, applicable to particular counties. *See Reynolds v. Sims*, 377 U.S. 533, 580–581, 84 S.Ct. 1362, 1391, 12 L.Ed.2d 506, 538 (1964) ("In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions"). Many of Maryland's counties have not established local legislative bodies.[6] For these "non-home rule" counties, the Maryland General Assembly is the local legislature. In practice, members of the General Assembly from such county (the county delegation) decide upon the legislation for the county and are the *de facto* local legislature. Home rule counties under Art. XI–A of the Constitution, which have local legislative bodies, may enact laws on subjects enumerated in the Express Powers Act, Code (1957, 1990 Repl.Vol., 1992 Cum.Supp.), Art. 25A, § 5, and in Art. 4, § 6, of the Code of Public Local Laws of Maryland. On subjects not covered by these grants of express powers, however, the county delegation in the General Assembly

---

Numerous other functions are carried out by the State on a county-by-county basis. By Art. IV, § 19 of the Maryland Constitution, our State judicial system is organized according to political subdivisions; each judicial circuit is made up of several counties. Each county has a circuit court, and each county has at least one circuit judge. Art. IV, §§ 20, 21. The State is represented by a State's Attorney in each county. Art. V, § 7. The State carries out registration of voters on a political subdivision basis, with an election board in each county. Furthermore, several national programs, such as the cooperative extension service and the soil conservation service, are operated on a county-by-county basis.

For thorough reviews of the responsibilities undertaken by and in political subdivisions, *see* Theodore J. Maher, *State–County Relations in Maryland*, 142–243 (1971); Don L. Bowen and Robert S. Friedman, *Local Government in Maryland*, 39–49 (Bureau of Governmental Research, College of Business and Public Administration, University of Maryland, 1955).

6. County Commissioners, under Art. VII, § 1, of the Maryland Constitution, largely "act as administrators or in an executive capacity," *City of Bowie v. County Comm'rs*, 258 Md. 454, 461, 267 A.2d 172, 176 (1970).

serves as the legislative body even for a home rule county. In addition, the General Assembly regularly makes exceptions to and variations in public general laws on a county-by-county basis. In addition, the State's annual Budget frequently makes appropriations on a county-by-county basis.

Dr. Carl Everstine, former Director of the Department of Legislative Reference, described the legislative procedure for local laws enacted by the General Assembly (Everstine, *Maryland Legislative Council, Local Government: A Comparative Study,* Research Report No. 23, 17 (September 1944)):

"The rules of procedure adopted and followed by the legislatures of other states' show an interesting contrast with those of Maryland, with respect to the committees to which local bills may be assigned.

"Local bills introduced into the General Assembly of Maryland usually are referred to the select committees made up, in the House, of the members of the county delegation concerned, and in the Senate, of the Senator from the county concerned and the senators from two adjoining counties. Occasionally, a bill which would affect only one county may yet have implications of State-wide importance which will lead to its being referred to a standing committee, but it is the general practice to refer all local bills to select committees, and the rest of the legislature accepts without question the recommendations of these committees. There are no standing committees to which all local bills may be referred, simply by virtue of their being local bills."

*See also* George A. Bell and Jean E. Spencer, *The Legislative Process in Maryland,* 85–87 (2d ed. 1963). In exercising these legislative functions, it is of paramount importance that the county delegations exist in the General Assembly. If county lines are ignored in the legislative redistricting process, this entire system of government will not function properly. Furthermore, a legislator simply cannot "represent his constituents properly—nor can voters from a fragmented district exercise the ballot intelligently—when a voting district is

nothing more than an artificial unit divorced from, and indeed often in conflict with, the various communities established in the State." *Karcher v. Daggett,* 462 U.S. 725, 787, 103 S.Ct. 2653, 2689, 77 L.Ed.2d 133, 178 (1983) (Powell, J., dissenting).

The great practical and historical significance of counties in Maryland is reflected in well-established constitutional principles. As discussed in Part II below, respect for political subdivision lines is the primary ground upon which deviation from equal population may be acceptable under equal protection principles. Moreover, respect for subdivision boundaries may well prevent other unwarranted tinkering with legislative districts. *See Reynolds v. Sims, supra,* 377 U.S. at 578–579, 84 S.Ct. at 1390, 12 L.Ed.2d at 537 ("Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering"). In addition, where various groups, such as minorities, have striven to attain influence in a particular subdivision, and have finally succeeded in acquiring such influence in the subdivision, a General Assembly redistricting plan which combines subdivisions for reasons other than population equality can undermine that political influence.

Even under the federal Constitution, where there is no express constitutional requirement that any regard be given to the boundaries of political subdivisions, the Supreme Court has recognized the importance of this consideration. In *Shaw v. Reno,* —— U.S. ——, ——, 113 S.Ct. 2816, 2827, 125 L.Ed.2d 511, 528 (1993), the Supreme Court discussed the "traditional districting principles such as compactness, contiguity, and *respect for political subdivisions* " (emphasis added). In Maryland, where Art. III, § 4, of the State Constitution explicitly commands that "Due regard shall be given to ... the boundaries of political subdivisions," it is unfathomable to have a legislative redistricting plan which sets out to disregard county lines. This plan's stated goal of not giving regard to subdivision lines but, instead, of promoting "regionalism," directly contravenes practical necessity, historical precedent, and, most importantly, violates the constitutional mandate.

The plan allows senatorial districts to overlap county boundaries 18 times. Five senatorial districts overlap the Baltimore City–Baltimore County border; the Baltimore City border is invaded four times for House districts. This Court should not hold valid a plan which unabashedly flouts the Maryland Constitution by failing to give the high regard to the boundaries of political subdivisions which is due.

## II.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires every State to "make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims, supra,* 377 U.S. at 577, 84 S.Ct. at 1390, 12 L.Ed.2d at 536. Any deviation from the equal population standard must be based on "'legitimate considerations incident to the effectuation of a rational state policy.'" *Mahan v. Howell,* 410 U.S. 315, 325, 93 S.Ct. 979, 985, 35 L.Ed.2d 320, 330 (1973). The right to vote includes the right to have one's vote count fully; "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds,* 377 U.S. at 555, 84 S.Ct. at 1378, 12 L.Ed.2d at 523–524.

These principles are fortified in Maryland by Art. 24 of the Maryland Declaration of Rights which "embodies the concept of equal protection of the laws to the same extent as the Equal Protection Clause of the Fourteenth Amendment." *Murphy v. Edmonds,* 325 Md. 342, 353, 601 A.2d 102, 107 (1992). In addition, Art. III, § 4, of the Maryland Constitution expressly requires that districts be of "substantially equal population." Thus, deviation from equal population in legislative redistricting implicates three separate constitutional provisions.

The petitioners in this case argue that the votes of residents of Montgomery County were impermissibly diluted by dividing the County into districts containing large populations, while at the same time, the votes of residents of the Baltimore area

(Baltimore City and Baltimore County) were impermissibly overweighted by dividing the area into districts of considerably smaller populations.

The right to vote is a fundamental right of citizens in a democratic society. "[S]ince the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds v. Sims, supra,* 377 U.S. at 562, 84 S.Ct. at 1381, 12 L.Ed.2d at 527. Consequently, the appropriate equal protection analysis is one employing the standard of strict scrutiny. *Kramer v. Union Free School District,* 395 U.S. 621, 625–630, 89 S.Ct. 1886, 1889–1891, 23 L.Ed.2d 583, 588–591 (1969), relying on *Reynolds v. Sims, supra,* 377 U.S. at 562, 84 S.Ct. at 1381, 12 L.Ed.2d at 527.[7] *See also Baker v. Carr,* 369 U.S. 186, 241–264, 82 S.Ct. 691, 723–736, 7 L.Ed.2d 663, 700–713 (1962) (Concurring opinions). Under this standard, "the Court must determine whether the [inequalities] are necessary to promote a compelling state interest." *Kramer v. Union Free School District, supra,* 395 U.S. at 627, 89 S.Ct. at 1890, 23 L.Ed.2d at 589. We should examine first the policies which the plan is said to advance. Then, if the policies are legitimate, and sufficiently important, we should examine

---

7. The Supreme Court applied strict scrutiny in invalidating a state election law in *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), which was not a reapportionment case. The Supreme Court reasoned, however, that because strict scrutiny is appropriate in reapportionment cases, it was also appropriate in that case. The Court stated (395 U.S. at 626–627, 89 S.Ct. at 1889–1890, 23 L.Ed.2d at 589):

"[S]tate apportionment statutes, which may *dilute* the effectiveness of some citizens' votes, receive close scrutiny from this Court. *Reynolds v. Sims, supra.* See *Avery v. Midland County,* 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). No less rigid an examination is applicable to statutes *denying* the franchise to citizens who are otherwise qualified by residence and age.... Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest."

the population disparities between districts to see if they exceed constitutional limits.

The redistricting plan contains legislative districts which are significantly unequal in population. The majority acknowledges these inequalities, and further acknowledges that the inequalities systematically benefit one area of the State—the metropolitan Baltimore area. 331 Md. at 596, 629 A.2d at 657. The stated reasons for the unequal distribution of representation under the plan are to promote "regionalism" and to recognize "communities of interest." I assume for the moment that these stated policies were not mere pretexts for pure discrimination in favor of one area of the State and against another area. Nevertheless, these policies cannot be considered legitimate legislative goals in light of the constitutional mandate to respect the boundaries of political subdivisions, which these policies directly contravene.

This Court has, in the past, decried the use of "communities of interest" as guidelines for legislative districting. *See In re Legislative Districting, supra,* 299 Md. at 692–693, 475 A.2d at 445 (calling the concept of communities of interest "nebulous" and stating that "no reasonable standard could possibly be devised to afford them recognition in the formulation of districts within the required constitutional framework"). Moreover, the Supreme Court has set forth the reasons which it considers sufficient to justify population discrepancies; the desires to promote regionalism and to support communities of interest are not among them. In *Reynolds v. Sims, supra,* the Supreme Court discussed at length the principles on which deviation from strict population equality might be accepted, and expressly rejected the notion that group interests can override the equal population principle. The Court stated (377 U.S. at 578–580, 84 S.Ct. at 1390–1391, 12 L.Ed.2d at 537–538, emphasis added):

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in

designing a legislative apportionment scheme. Valid considerations may underlie such aims.

＊　＊　＊　＊　＊　＊

"So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. *But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation.*"

The Supreme Court in other cases has upheld deviations from the equal population principle only on the basis of the State's desire to preserve the integrity of its political subdivisions. *See, e.g., Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1159, 122 L.Ed.2d 500, 516 (1993) (a State can justify deviations by its desire to maintain political subdivision lines); *Brown v. Thomson,* 462 U.S. 835, 846–848, 103 S.Ct. 2690, 2698–2699, 77 L.Ed.2d 214, 224–225 (1983) (population deviations were constitutionally permissible in light of the need to preserve county representation in Wyoming); *Mahan v. Howell, supra,* 410 U.S. at 325–326, 93 S.Ct. at 985–986, 35 L.Ed.2d at 330–331 (deviations from equal population are justified on the basis of respect for the political jurisdictional lines of the counties and cities). *See also Karcher v. Daggett, supra,* 462 U.S. at 740, 103 S.Ct. at 2663, 77 L.Ed.2d at 147 (deviations may be justified by the policy of respecting municipal boundaries, among others); *Abate v. Mundt,* 403 U.S. 182, 187, 91 S.Ct. 1904, 1908, 29 L.Ed.2d 399, 403 (1971) (upholding an apportionment for a county legislative body having a maximum deviation of 11.9%, in light of New York's long history of maintaining the integrity of existing local government units within the county). I am aware of no Supreme Court case which upholds a deviation from the equal population principle on any other basis. The population deviations in the plan now before us are not a result of this legitimate and important concern.

Moreover, I doubt that "communities of interest" and "regionalism" provided the major impetus for the population disparities in the plan. The majority apparently does not believe this rationale either, stating that "the Governor's plan appears to systematically afford the City the maximum number of representatives in the legislature as its population can support." 331 Md. at 596, 629 A.2d at 657. It is undisputed in this case that the districts with the smallest numbers of voters per district lie in the Baltimore area; eleven of the twelve smallest districts in the State are in the Baltimore City–Baltimore County area. The implication is that the drafters of the plan made a systematic attempt to overrepresent the voters in one area of the State by affording them the largest number of representatives for the fewest number of people, and conversely, to underrepresent the voters in other areas.

Obviously uncomfortable with the clearly discriminatory plan, the majority seeks to justify it by asserting that, although the deviations benefit the voters of the Baltimore area, they do not do so at the expense of any other region.[8] I do not agree. The plan obviously discriminates against the Washington metropolitan area, and particularly Montgomery County. The districts with the largest number of voters in each district lie in Montgomery and Prince George's Counties; these counties account for nine of the fourteen largest districts in the State. According to the 1990 census, the population of Montgomery County exceeds that of Baltimore City. Under the Plan, however, the voters of Baltimore City elect 8 Senators and 24 Representatives, while the voters of Montgomery County elect only 7 Senators and 21 Representatives. It

---

8. The majority's comment, 331 Md. at 597, 629 A.2d at 657, that people and not territory are to be represented in the General Assembly, serves only to distract from the real issues at hand. We are concerned here with the systematic dilution of the votes of citizens living outside of a favored territory, not with some scheme of representation of the territory itself. We measure disparities between districts because of the principle that districts are to be comprised of equal numbers of people, not because we are concerned with discrimination against the "district" per se.

seems that the citizens of Montgomery County bear much of the expense of the Baltimore area's overrepresentation.

Furthermore, there is harm to the voters living in every other area of the State, even assuming that the plan does not intentionally discriminate against any particular region. The General Assembly consists of a finite number of delegates and senators. Under Art. III, § 2, of the Maryland Constitution, there are 141 Delegates and 47 Senators. Any increase in the number of representatives for one area necessarily results in a decrease in the number of representatives per capita for other areas of the State. "Overweighting and overvaluation of the votes of those living here has the certain effect of dilution and undervaluation of the votes of those living there." *Reynolds v. Sims, supra,* 377 U.S. at 563, 84 S.Ct. at 1382, 12 L.Ed.2d at 528. The majority seems to recognize the relationship between granting excessive representation to the people of one area, and underrepresentation to others. Nevertheless, the majority seems to be willing to overlook the resultant dilution of votes because, in its view, no particular "region in the State is seriously and disproportionately underrepresented as a result." 331 Md. at 598, n. 19, 629 A.2d at 658, n. 19. In setting out this high threshold for recognizing an injury, the majority all but ignores the fundamental right of every citizen in every region of the State to have his or her vote count equally. The standard set forth by the majority allows deliberate vote dilution on the basis of pure geographic favoritism.

After dismissing this geographic discrimination as not rising to the level of a constitutional violation, 331 Md. at 597, 629 A.2d at 657, the majority further implies that this discrimination might be constitutionally justifiable. The majority implies that systematically favoring the Baltimore metropolitan area (a region "with waning political clout but urgent political needs") with disproportionately high representation could constitute a rational state policy "so long as no other region in the State is seriously and disproportionately underrepresented as a result." 331 Md. at 598, n. 19, 629 A.2d at

658, n. 19.[9] This implication is an assault on the very concept of representative government. The "political needs" of an area cannot justify diluting the votes of the rest of the citizens of the State. The Supreme Court "clearly established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." *Reynolds v. Sims, supra,* 377 U.S. at 560–561, 84 S.Ct. at 1381, 12 L.Ed.2d at 526, discussing *Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). Later, the Supreme Court specifically "underscored the danger of apportionment structures that contain a built-in bias tending to favor particular geographic areas or political interests. . . ." *Abate v. Mundt, supra,* 403 U.S. at 185–186, 91 S.Ct. at 1907, 29 L.Ed.2d at 403. *See also Brown v. Thomson, supra,* 462 U.S. at 843–844, 103 S.Ct. at 2696–2697, 77 L.Ed.2d at 222–223 (upholding Wyoming's redistricting plan, which contained a substantial deviation from equal population, and noting that it exhibited no "built-in bias tending to favor particular political interests or geographic areas"). The purposeful promotion of the interests of one region of the State over others cannot be a legitimate basis for deviation from equal population principles as a matter of law. *See Gray v. Sanders,* 372 U.S. 368, 380, 83 S.Ct. 801, 808, 9 L.Ed.2d 821, 830 (1963) ("the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications").

The GRAC's stated rationales for the significant population deviations within the plan are not compelling or even legitimate State interests. Consequently, the plan fails the equal protection scrutiny to which we must subject it.

The majority, however, skips entirely the first step in this equal protection analysis and refuses to examine the justifica-

---

**9.** A merely "rational" state policy would be insufficient to justify the significant deviations from population equality in the plan. As discussed earlier, only a compelling state interest may justify significant deviations, and even then, it only justifies those deviations which are necessary to serve that interest.

tion for the disparities. Instead, it holds that population disparities between legislative districts of less than ten percent are virtually insulated from review. The majority relies on the dictum in *Brown v. Thomson, supra,* 462 U.S. at 842, 103 S.Ct. at 2696, 77 L.Ed.2d at 222, to the effect that, as a general matter, deviations of less than ten percent are *de minimis.* The majority overlooks another statement in *Brown,* making it clear that the Supreme Court's analysis of the unique situation presented by that case "does not mean that population deviations of any magnitude necessarily are acceptable." 462 U.S. at 844–845, 103 S.Ct. at 2697, 77 L.Ed.2d at 223. The majority also ignores the Supreme Court's *holdings* that deviations from the strict equal population principle are permissible only when "*necessary* to permit the State[ ] to pursue other legitimate objectives." *Brown v. Thomson,* 462 U.S. at 842, 103 S.Ct. at 2696, 77 L.Ed.2d at 221 (emphasis added). *See also Mahan v. Howell, supra,* 410 U.S. at 325, 93 S.Ct. at 985, 35 L.Ed.2d at 330 ("deviations from the equal-population principle are constitutionally permissible" only "so long as the divergences ... are based on legitimate considerations incident to the effectuation of a rational state policy"); *Reynolds v. Sims, supra,* 377 U.S. at 581, 84 S.Ct. at 1392, 12 L.Ed.2d at 538–539 ("careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the *character* as well as the degree of deviations from a strict population basis") (emphasis added). *Cf. Wesberry v. Sanders, supra,* 376 U.S. 1, 18, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (discussing "our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal ...").

Contrary to the majority's view, the equal population principle is of utmost importance. The Supreme Court has stated (*Reynolds v. Sims, supra,* 377 U.S. at 581, 84 S.Ct. at 1392, 12 L.Ed.2d at 539):

"even [if] as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legisla-

tive body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired."

The majority's view that "the Supreme Court has unequivocally built a 10% degree of flexibility into the one person, one vote requirement so that states can accommodate important concerns in reapportioning their legislatures," 331 Md. at 595, 629 A.2d at 656, is simply incorrect. A significant deviation of less than 10% is permissible only for valid reasons.

The ten percent rule serves only as a threshold for establishing a *prima facie* case of discrimination. If the population deviation between legislative districts is greater than ten percent, a citizen challenging the districting plan has established a *prima facie* case of discrimination, shifting the burden to the State to show that the plan is not discriminatory. If the population disparity is less than ten percent, however, citizens must still have an opportunity to show that the population deviations were not based on legitimate considerations. As the Court stated in *Brown v. Thomson, supra,* 462 U.S. at 845–846, 103 S.Ct at 2697–2698, 77 L.Ed.2d at 224:

"The consistency of application and the neutrality of effect of the nonpopulation criteria must be considered along with the size of the population disparities in determining whether a state legislative apportionment plan contravenes the Equal Protection Clause."

The majority, however, asserts that unless "the plaintiff can present compelling evidence that the drafters of the plan ignored all the legitimate reasons for population disparities and created the deviations *solely* to benefit certain regions at the expense of others," 331 Md. at 597, 629 A.2d at 657, deviations under ten percent will not be scrutinized. Furthermore, the majority will not accept the plan itself as evidence of improper discrimination, even when, as in this case, the plan on its face favors one area over all others generally and discriminates against certain areas in particular. As an initial matter, there is no reason to discount the evidentiary value of the plan in making out a *prima facie* case of discrimination;

the best possible evidence of improper geographic discrimination would seem to be the plan itself. *Cf. Shaw v. Reno, supra,* —— U.S. at ——, ——, 113 S.Ct. at 2824, 2832, 125 L.Ed.2d at 525, 536 (redistricting plan "on its face" was such that "it rationally can be viewed only as an effort" to accomplish an illegitimate purpose "without regard for traditional districting principles and without sufficiently compelling justification").

Moreover, there is no support in the cases for the view that population deviations of less than ten percent are never subject to question. *Brown v. Thomson, supra,* and *Voinovich v. Quilter, supra,* each hold that major deviations from population equality, in themselves, are sufficient to make out a *prima facie* case of discrimination. A deviation of less than ten percent is not considered "major" within this rule, according to *Brown.* Therefore, as pointed out above, a citizen challenging the apportionment must show more than the mere percentage deviation in order to make out a *prima facie* case and in order to require justification by the State. The rule is not, as the majority opinion states, that deviations of less than ten percent do not require justification by the State; the rule is that deviations of less than ten percent do not, in and of themselves, require justification by State in the manner that larger deviations do. The *Brown* case simply does not stand for the proposition that a percentage deviation of less than ten percent is constitutional under all circumstances, as the majority opinion suggests.[10]

The overriding constitutional objective in legislative districting is population equality among districts; this objective is not served by ignoring so-called minor deviations which are not based on legitimate principles. As pointed out by the Su-

---

10. The majority opinion cites two cases as authority for its notion that population deviations of less than ten percent never require justification by the State: *Brown v. Thomson,* 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), and *Voinovich v. Quilter,* —— U.S. ——, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993). *Voinovich* merely quotes the *Brown* opinion; it does not provide more guidance in this matter. —— U.S. at ——, 113 S.Ct. at 1159, 122 L.Ed.2d at 516.

preme Court, "[i]f state legislators knew that a certain *de minimis* level of population differences was acceptable, they would doubtless strive to achieve that level rather than equality." *Karcher v. Daggett, supra,* 462 U.S. at 731, 103 S.Ct. at 2659, 77 L.Ed.2d at 141. In fact, this is exactly what happened in the case at bar. The GRAC's goal was not population equality; instead, the GRAC crafted the plan with the express target of ten percent deviations between districts. The GRAC on June 11, 1991, adopted a set of "Legal Standards for Plan Development," which included the following statement of principle: "The population of any legislative subdistrict shall be substantially equal to the appropriate fraction of the Senate district population. Deviations from the ideal Senate district or legislative subdistrict population should not exceed +5% or − 5% (except as may be necessitated by other constitutional requirements)." The GRAC Chairperson later remarked (at the beginning of the December 10, 1991 hearing) that it was one of the committee's goals to have "legislative districts fall within 5 percent of the ideal population." Thus, instead of making the required good faith effort to construct districts which are virtually equal in population, deviating only to accommodate other constitutional requirements, the GRAC set out to construct a plan which contained districts of unequal population as an initial matter.

The plan deviates significantly from the overriding constitutional imperative of equal population, and the deviations were not for legitimate constitutionally recognized reasons. Consequently, the votes of numerous citizens of this State have been impermissibly diluted.

### III.

The majority's decision upholding this legislative redistricting plan, I am afraid, sends a message to future Governors for many decades that, in preparing a General Assembly redistricting plan, they need not be concerned about the constitutional criteria set forth in Art. III, § 4, because, as long as the population discrepancies are no greater than 10%, the Court of Appeals will uphold the plan regardless of the reasons for the

population discrepancies and regardless of the other constitutional criteria.

I would hold that the legislative redistricting plan at issue violates the Equal Protection Clause of the Fourteenth Amendment, violates Art. 24 of the Maryland Declaration of Rights, and violates Art. III, § 4, of the Maryland Constitution. Consequently, I would refer the plan to a Special Master. The Special Master could be Judge Smith, who has already served in that capacity, or, if he is unavailable, a different Special Master. The Special Master should recommend to this Court modifications of the plan so that the constitutional deficiencies regarding the districts for Baltimore County, Baltimore City and Montgomery County might be rectified. In making his recommendations, the Special Master should consider any alternate plans which have already been submitted in this redistricting effort, as well as any new submissions from the parties which they may wish to make, although he should not be limited to particular alternate plans which have been or will be submitted.

Only the districts relating to Baltimore County, Baltimore City and Montgomery County have been specifically challenged, but the Special Master's recommendations might affect other areas. This effect is not likely to be great; nonetheless, the necessary modification should be accomplished with as little disruption to other areas as possible.

I realize that I would have the Court take on what may seem to be a difficult task. I point out, however, that the Court has invalidated a redistricting plan in the past. *See In re Legislative Districting,* 271 Md. 320, 317 A.2d 477, *cert. denied,* 419 U.S. 840, 95 S.Ct. 70, 42 L.Ed.2d 67 (1974). Moreover, it is the constitutional duty of this Court to grant relief from an unconstitutional legislative districting plan. The perceived difficulty of the task should not excuse its performance.

Judge ROBERT M. BELL has authorized me to state that he concurs with the views expressed herein.